IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| United States of America, ) | |
| ) | |
| v. ) | |
| ) | No. 14 CR 112 |
| Jon Giles, ) | |
| ) | Judge Ronald A. Guzmán |
| Defendant. ) | |
| ) | |

# MEMORANDUM OPINION AND ORDER

For the reasons stated below, the defendant's motion to suppress [25] is denied.

## STATEMENT

Defendant Jon Giles has filed a motion seeking to suppress the statements he made to law enforcement agents during his custodial interrogation on August 30, 2013. After forensic tests revealed the defendant's DNA on a glove dropped by the perpetrator at the scene of a bank robbery, two FBI agents travelled to the Pontiac Correctional Center, where the defendant was serving a prison term for another offense, to interview him. The defendant contends that his waiver of Fifth Amendment rights was not voluntary, knowing, and intelligent due to his mental state at the time of his interrogation. The Court held an evidentiary hearing to resolve the factual disputes raised by the motion.

The government bears the burden of proving that a defendant's post-arrest statement was made following his voluntary, knowing and intelligent waiver of Miranda rights. *United States v. Shabaz*, 579 F.3d 815, 820 (7th Cir. 2009). As the Seventh Circuit has stated:

> [W]hether a person in custody knowingly and voluntarily waives his Miranda rights depends upon the totality of the circumstances. A waiver need not be express, but may be 'inferred from the defendant's understanding of his rights coupled with a

> course of conduct reflecting his desire to give up his right to remain silent and have the counsel of an attorney.' Courts typically look at such factors as defendant's background and conduct, the duration and conditions of detention, the mental and physical condition of the defendant, the attitude of the police, and whether the police utilized psychological or physical coercion.

*United States v. Jackson*, 300 F.3d 740, 748 (7th Cir. 2002) (internal citations omitted).

According to the defendant, the conditions of imprisonment he experienced prior to his waiver rendered him incapable of exercising a voluntary and knowing waiver of his rights. In particular, the defendant references the lack of ventilation in the segregation cells in which the defendant was housed, excessive heat and cold in the segregation cells, the lack of a cell window or yard space, and the small size of his cell. The defendant also points to the fact that he was in segregation, his resulting lack of contact and communication with other inmates, the adverse effects of the tear gas used during cell extractions on inmates who, like him, have asthma, and certain disciplinary measures he was subjected to, including restrictions on his yard time and contact visits.

With respect to the defendant's time in segregation and solitary confinement, he cites to medical studies that show specific psychopathological effects - such as ruminations, irrational anger, oversensitivity to stimuli, confused thought process, social withdrawal, chronic depression, and emotional flatness – that can result from prolonged solitary confinement. The studies, however, are generalized statements of findings with respect to other unknown inmates and not specific to this defendant, nor his particular conditions of confinement. They are probative only to the extent that they establish possible effects on an average inmate given the particular conditions of confinement contemplated in the studies, which alone are not sufficient to establish this defendant's mental condition at the time of his particular interview. For that purpose, the defense called Dr. Joel M. Silberberg, a psychiatrist who examined the defendant. According to Dr. Silberberg, the defendant

did not appreciate the significance of the Miranda warning given to him on August 30, 2013, and his subsequent confession was not the product of a free and voluntary mind.[1]

In coming to that conclusion, Dr. Silberberg performed a forensic psychiatric evaluation of the defendant for three hours on November 4, 2014, and reviewed documents sent to him by defense counsel, including the Illinois Department of Corrections ("IDOC") administrative and medical records from Tamms Correctional Center and Pontiac Correctional Center, Chicago Police Department documents, and FBI investigative records and its documentation of the confession of August 30, 2013. Dr. Silberberg concluded from reviewing these records that the defendant had been in segregation at Tamms for approximately two years before he was transferred to Pontiac. After being transferred to Pontiac, the defendant was in the general population for approximately one month before returning to segregation from January 2013 until January 2014.

According to Dr. Silberberg, the literature in his field documents the effects of prolonged solitary confinement, which can include impairments in memory, attention, concentration, and reality testing.[2] Prolonged solitary confinement also produces impaired executive functions of the brain by interfering with the ability to integrate information and make reasonable and rational decisions based upon information received.[3] It can also cause mood disorders such as depression, anxiety, or

---

[1] Dr. Silberberg's qualifications were not challenged. In summary, he is a distinguished fellow of the American Psychiatric Association, has been board certified in psychiatry and forensic psychiatry since 1985 and 1999 respectively, and was Director of Mental Health Services for Cermak Health Services of Cook County - the health care provider for Cook County Jail - for four years. Dr. Silverberg is also familiar with Pontiac Correctional Institution, having personally toured the Pontiac facility and inspected the segregation area there in a previous case.

[2] The defendant described to Dr. Silberberg hallucinations about hooded figures that others said they did not see.

[3] According to Dr. Silberberg's report, he uses the terms prolonged solitary confinement and segregation interchangeably. (Silberberg Report, Dkt. # 60-3, at 1.)

agitation. According to Dr. Silberberg, these effects can be transient, and an individual may be competent at one point in time and not at another.

Dr. Silberberg also testified that the defendant's asthma, aggravated by the hot and humid conditions and the use of tear gas during extractions, could cause constriction in the air passages leading to a lack of oxygen to the brain, thus impairing thinking and judgment. Dr. Silberberg also opined that medication the defendant was given for his asthma was steroidal and could predispose him to depression and even psychotic symptoms, such as impaired reality testing, making him more vulnerable to the psychological effects of segregation.[4] He further opined that a person with a history of mental illness would be more susceptible to the psychological effects of segregation. From his review of the records, Dr. Silberberg learned that at age 20, the defendant was given medication for "emotional reasons" and in 2009 was "noticed" to have depression and anxiety. Furthermore, between 1999 and 2009, the defendant suffered three head injuries, two of which stemmed from car accidents and the third from a gunshot wound to his head, for which the defendant had surgery. The doctor also considered that the defendant's aunt suffered from psychiatric illness and committed suicide, and that the defendant was taking a pain reliever for low back pain as additional factors that could put the defendant in a high risk category of individuals who might suffer adverse consequences from segregation. Dr. Silberberg testified that it would be human nature for anyone who had been in segregation for three years to want to do "almost anything" to stay out of segregation, even if only for a brief period of time.

In his report, Dr. Silberberg concluded that the defendant did not appreciate the significance of the Miranda warning given him on August 30, 2013 and that his confession on August 30, 2013 was not the product of a free and voluntary mind. (Silberberg Report, Dkt. # 60-3, at 2, 3 and 12.) Dr.

---

[4] Although the medication was discontinued sometime prior to the FBI interview, Dr. Silberberg could not recall when.

Silberberg, however, was not at the August 30 interview with the FBI agents and further did not speak with the agents about the circumstances surrounding the interview or the defendant's demeanor during the interview.

The defendant did not testify at the hearing, but the testimony of other fact witnesses contradicts Dr. Silberberg's conclusion. The defendant's actions before and during the interview, as described by the three fact witnesses, was both normal and much too logical for a person who lacks the ability for rational decision making or a free will. Robin Lopeman, a 27-year career correctional officer in IDOC, testified that she escorted the FBI agents to the interview room and helped facilitate the initial communication with the defendant. According to Officer Lopeman, the defendant initially refused to come to the internal affairs unit, so she took FBI Special Agent Tim Bacha's business card to the defendant, who in turn instructed her to take the business card to another inmate a few cells away. That inmate responded by hollering to the defendant that it was all right for him to go, and only then did the defendant agree to speak to the FBI agents. Officer Lopeman recalled that the defendant was not naked when she spoke to him. This would seem to contradict what the defendant told Dr. Silberberg. Officer Lopeman's testimony established that the defendant did not lack the capacity to refuse to talk to the FBI agents because that is precisely what he initially did. In that regard, Officer Lopeman's testimony was credible and stands unrebutted. In fact, her version is corroborated both by Agent Bacha and inmate Robert Hall. Furthermore, before changing his mind and agreeing to meet with the agents, the defendant checked with another inmate in a different cell, thus indicating that the defendant was considering his options and making a rational choice in determining whether he was willing to leave his cell and speak to the law enforcement officers. When questioned on this point, Dr. Silberberg responded that the defendant's conduct when first approached to speak with the agents demonstrated his confusion and delusional state in that he could not initially understand what he was

being asked to do. However, given the totality of the circumstances surrounding the interview, and the testimony of fellow inmate Robert Hall, Officer Lopeman, and Agent Bacha, the Court finds Dr. Silberberg's opinion regarding the defendant's actions and state of mind just before and during the interview to be unsupported.

The defendant's fellow inmate Robert Hall testified for the defense. He stated that he is a member of the Four Corner Hustlers street gang and is incarcerated for the commission of first-degree murder. He has been acquainted with the defendant for approximately 17 years. He recalled the events of August 30 because, he testified, there was a lot going on that day and he went to speak to the defendant before they went to the yard.[5] Contrary to Officer Lopeman's testimony, Hall recalls being in a cell located directly above the defendant, not down the hallway, on the day of the confession. In any event, Hall remembered being shown, at the defendant's request, a federal agent's business card by one of the guards. According to Hall, if an inmate was going to speak to any type of law enforcement, internal security or correctional officers, it was "home grown policy" for that inmate to let other inmates know where he was going and to whom he was going to speak. So, the defendant asked Officer Lopeman to take the card to Hall to let him know what was going on. From this testimony, it appears that the prisoners were reasonably well organized and had established a network to keep tabs on each other. It is also clear that the defendant understood the nature of their organization and communicated with Hall in compliance with the "home grown policy." This compliance tends to indicate that the defendant was thinking clearly and aware of his ability to refuse to see the FBI agents. He was also cognizant of the rules regarding his relationship to other inmates.

These actions, initially refusing to see the agents, then seeking approval to do so, are contrary to the picture of a person who is not fully in touch with reality, hallucinating, or unstable and therefore

---

[5] From this statement, it would appear that the prisoners were able to engage in person- to-person conversations with each other and discuss daily events.

lacking the ability to make rational conscious choices. It is also at odds with the description of the defendant as a person made so desperate for contact with other human beings that he would have automatically agreed to the interview just to obtain relief from a long period of sensory deprivation. The description given of the events surrounding the interview by the fact witnesses who were actually there contradict Dr. Silberberg's opinion.

Hall also testified regarding the conditions in Pontiac prison. The cells were 6 feet wide and 10 feet tall with no air-conditioning, no ventilation, and Plexiglass or solid steel doors. He and other inmates had filed grievances complaining of rodent infestation, an abundance of trash, filthy showers, and that items shared by inmates, including shaving tools, leg irons and handcuffs, were not sanitized between uses. The only way the inmates could communicate was by talking in the yards or by passing "kites" to each other. Yard activities for those in segregation were restricted to two hours twice a week in 3' x 8' pods that looked like dog kennels, and no physical contact was possible. Hall also testified that the defendant was subjected to a cell extraction within a week prior to the visit from the FBI agents and had been extracted several times while they were together at Pontiac. Each extraction resulted in a suspension of visitation for a minimum of 90 days. According to Hall, prisoners in segregation are allowed to purchase items at the commissary and use the law library twice a week, are fed three meals a day and allowed televisions and books.

Hall testified that the defendant was, at least at one time, a member of the Four Corner Hustlers street gang, which corroborates what the defendant told the special agents during his interview. Hall stated that he considered the defendant to be an opinionated individual of fair intelligence, and had no difficulty communicating with him. In response to the Court's questions, Hall indicated he spoke to the defendant regularly. Apart from the defendant sometimes making statements that "we laugh off," Hall stated he noticed nothing really unusual about the defendant

during his interactions with him. Hall's opinion in this regard must be given a substantial amount of weight as he has known the defendant for approximately 17 years and, at one time at least, was a fellow member of the same street gang. If the defendant were delusional, out of contact with reality, unable to reason logically or act reasonably, a person who interacted with him on a fairly regular basis and had known him for 17 years would have said so.

Agent Bacha also testified. He confirmed the testimony of Officer Lopeman and inmate Hall that the defendant initially refused to speak with him and the other agent, Agent Lovernick. Agent Bacha also confirmed that he gave his business card to Officer Lopeman, and shortly after that, they were taken to the internal affairs section in the administrative building of the prison. After the defendant arrived and before commencing the interview, Agent Bacha stated that he read the defendant his Miranda rights from a preprinted FD 395 advice of rights form, *see* Gov't's Resp., Dkt. # 39-1, and had the defendant read the consent portion back to him. According to Agent Bacha, the defendant was able to read the waiver of rights form without any problems and agreed to sign the form before he was interviewed. In doing so, the defendant confirmed that he understood his rights and was willing to waive his rights and answer questions without a lawyer being present. Agent Bacha testified that the reason he asked the defendant to read back the consent portion of the Miranda rights form was to gauge his level of intelligence and ability to understand the language of the document he was signing. Agent Bacha stated that nothing in the defendant's manner gave Agent Bacha any cause for concern or basis for believing he was not competent to waive his rights.

After the waiver of rights, Agent Bacha initially asked questions that were unrelated to the bank robbery. The defendant responded by informing the officers that he was a member of the Four Corner Hustlers street gang from the Roseland neighborhood and that he held the rank of "minister of justice." Agent Bacha stated that the defendant explained to the officers the hierarchy of his gang.

Agent Bacha described the defendant's demeanor as cordial and relaxed, and testified that, at times, the defendant joked with the agents. The defendant initially denied knowing anything about any bank robbery until Agent Bacha showed him two photographs from the crime scene, which displayed a latex glove and a pile of money, both with red dye on them. Agent Bacha also showed the defendant a report from the FBI laboratory in Quantico, Virginia, which concluded that his DNA profile had been found on the latex glove. According to Agent Bacha, after looking at the report, the defendant looked up at him and asked where he should start. The defendant then described going to the north side of Chicago and robbing a small community bank. Moreover, Agent Bacha testified that two years after the robbery, the defendant was still able to give specific details about the event, such as the gender of the teller he robbed and the exact getaway he executed. When Agent Bacha asked about any other criminal activity he might be aware of, the defendant indicated that he did not want to do the rest of his life in prison, understood about "downward departures" and could inform the officers of the location of money and drugs that were out on the streets.

In response, Agent Bacha explained that he could not promise anything but would take the information to the United States Attorney's Office, which would decide how to proceed. Agent Bacha then asked the defendant if he had knowledge of any unsolved murders. The defendant responded by stating that if the officers wanted to talk about bodies, then that was something he would have to think about. Before leaving, the defendant told the officer to contact his Assistant United States Attorney ("AUSA") and have the AUSA bring him up to Chicago to talk about the drugs and the money. The defendant also signed a consent-to-search form and agreed to give a sample of his DNA.

During the approximately 90-minute encounter with the defendant, Agent Bacha noticed no signs of mental distress or anything else that would cause him concern about the defendant's mental

health.  Agent Bacha testified that the defendant did not appear disoriented at any point.  The agent neither threatened nor promised anything and his testimony describes a person who was relaxed and in control of his faculties.  Indeed, the defendant appears to have engaged in some rather sophisticated thinking.  In particular, he denied involvement in the robbery until it was no longer feasible to do so after being shown incriminating evidence.  The defendant then switched tactics and confessed, but was quick to consider offering information about other crimes in exchange for a reduction in his sentence.  He discussed "downward departures" in a manner that made sense given his situation and stated that he was not willing to talk about "bodies" – at least not without giving it some further thought.  Again, the Court finds that, if true, this testimony describes a rational individual able to think in terms of alternatives and options that would benefit him.  It is one thing to inform on a drug dealer; it is a much more serious undertaking to inform on a killer.  That the defendant should be conscious of this distinction and reserve making such a commitment until he had more time to consider the consequences is logical and reflects an understanding of the significance of the choices he was making.

       The Court finds the defendant's conduct and statements to reflect a clear, intelligent, and knowledgeable thought process for anyone in the defendant's difficult situation.  From his initial refusal to meet with the law enforcement agents to his last comments to Agent Bacha, the defendant's statements and actions are contrary to those of a person who is unable to appreciate either his rights or the effect of waiving his rights.  They are also inconsistent with a person who lacks free will.

For these reasons, the Court finds the totality of the evidence establishes that at the time in question, the defendant was a rational person who was in touch with reality, able to consider his options, and make intelligent, rational choices in light of his realistic alternatives.  Thus, the Court concludes that the defendant was able to appreciate the significance of the Miranda warnings given to him, his waiver of those rights was knowing and intelligent, and his confession was the product of a free and voluntary mind.  The motion to suppress is, therefore, denied.

**Date:**  October 7, 2015

_____
**Ronald A. Guzmán**
**United States District Judge**